UNITED STATES DISTRICT COURT FOR
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JOHN TOBIAS,

        Plaintiff,

                                       Case Number 12-10818

v.                                       Honorable Thomas L. Ludington

NICHOLAS PLETZKE and LYLE ESTERHAI,

        Defendants.

_____ /

**OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

A 16-year-old girl sits in a squad car talking to a police officer. The girl's father kicked a wall in her bedroom, she tells the officer. And hit her in the face with a pillow and kneed her in the back, which is why she called 911. Starting to cry, she tells the officer: "I want to get out of here. I can't stay here. Anyway, my brother can't get away with anything. I can't get away with anything. And my dad smokes, grows, and sells pot!"

The officer asks whether drugs are in the house. "Yeah," answers the daughter. "Will your boyfriend's parents come get ya?" the officer asks. "Yes," answers the daughter. "They come get ya for the night, I [will] go up and watch you pack a couple of your things," the officer volunteers.

The two exit the squad car and walk towards the girl's house. The father, watched by a second police officer, is standing calmly on the front porch. He is behaving neither aggressively nor threateningly (at least viewing the facts in the light most favorable to the father, as this Court must on the officers' motion for summary judgment).

The first officer calls out to the father, asking if the daughter can go inside to pack a few things and then spend the night at her boyfriend's parents' house.  "Go pack your couple things," the father tells his daughter.  "Ok, I'm going to walk up with her and make sure she's packing, alright?" interjects the officer.  "No," responds the father.

The daughter speaks up that the officer can go inside the house with her.  Again, the father refuses, directing his daughter: "Go pack your things and get up down here."  The daughter responds: "You're just afraid he's going to find your stash, dad."  The officer asks: "Is there something to hide?"  "No, I ain't got nothing to hide," the father answers.  "Then what is the problem with me going up there?" the officer asks.  "You don't have a warrant," the father answers.

"I don't have to have a warrant," the officer responds, "the welfare of your child is my main priority."  Offering the father a choice, the officer continues: "Either you are going to be seated right here while I go up there or you are going to go in the back of my car while I go up there — which way do you want it?"  The officer then proceeds inside the house with the daughter, while the father remains on the porch watched by the second officer.

Is that entry justified by "exigent circumstances"?  The father, contending that it was not, filed a § 1983 claim against the officers.  The officers, arguing that it was, move for summary judgment on that claim (and the six others that the father has raised).

The answer, as detailed below, is clearly established.

# I

Plaintiff John Tobias is the father of a son and a daughter.  At the time of the events giving rise to this case (in September 2008), both children lived with him in Hampton Township,

Michigan.   The children's mother, Plaintiff's former wife, did not.   The son was 14.   The daughter, 16.

Defendants Nicholas Pletzke and Lyle Esterhai were Hampton Township police officers.

## A

Thursday, September 25, 2008, began uneventfully for Plaintiff.   *See* Tobias Dep. 53, July 10, 2012, *attached as* Defs.' Mot. Ex. 4.   That morning, he recalls: "I did some lawn work, a little housework, and that was it."   Tobias Dep. 53.   Around 1 pm, he smoked a joint.   Tobias Dep. 53.   He then "went to town and got a couple — a few groceries and stopped to get some gas in my car and realized I didn't have any money on my debit card."   Tobias Dep. 53.

Returning home a little before 4 pm, Plaintiff "got on the phone to my debit card company. . . .   I found out that my daughter used my debit card to buy phone minutes."   Tobias Dep. 54, 57.   Plaintiff then called his daughter; she said that she would be home around 10 pm.   Tobias Dep. 57.   Plaintiff waited.

While he waited, Plaintiff recalls, he did some "harvest trimming."   Tobias Dep. 56.   He explains: "I had some marijuana plants to trim so that's what I did."   Tobias Dep. 56.

Six hours passed.

## B

About 10 pm, the daughter came home.   Tobias Dep. 55.   "I was angry with her," Plaintiff remembers.   Tobias Dep. 55.   In his deposition, he was asked:

Q:     [W]hat happened when she got in the door?

A:     I confronted her.

Q:     Did you yell at her?

A:     Yeah, I confronted her.

> Q:     What did she do?  Did she yell back or just leave or what?
>
> A:     She yelled back and went upstairs.

Tobias Dep. 57–58.  Fifteen minutes later, Plaintiff went up to his daughter's room.  Tobias Dep.

58.  "It was a brief argument," Plaintiff recalls.  Tobias Dep. 58.  Inquiring further, Defendants'

counsel asked:

> Q:     Was there any violence or anything at all that occurred while you
>        confronted your daughter up in her room?
>
> A:     I kicked a hole in the wall.
>
> Q:     Okay.
>
> A:     She got a cut on her hand.  I don't know how it happened.
>
> Q:     All right.  Did you have any physical contact with her?
>
> A:     No.
>
> Q:     She, at least according to this [police report], says that you kicked her in
>        the butt.
>
> A:     Oh, okay.  Kneed her in the butt.  I didn't kick her in the butt.
>
> Q:     Okay.  So there was some physical contact?
>
> A:     If that is what you call physical contact. . . .
>
> Q:     Okay.  And then did you hit her in the face with a pillow?
>
> A:     No.
>
> Q:     All right.  Didn't happen?  Did you grab her arm?
>
> A:     I might have grabbed her arm.
>
> Q:     Okay.  Did you tell her to get out or something to that effect because she
>        had violated the rules?
>
> A:     Yes.   Which was already — she already was arranged to go to her
>        grandma's.

Tobias Dep. 61–62.  Plaintiff left his daughter's room.  She called 911.  Pletzke Aff.¶ 4, *attached as* Defs.' Mot. Ex. 9; *see also* Tobias Dep. 63.

### C

The 911 call came in at 10:48 pm.  *See* Pletzke Aff. ¶ 4.  Officers Pletzke and Esterhai were dispatched to Plaintiff's home.  Esterhai Dep. 20, 37, Sept. 28, 2012, *attached as* Defs.' Mot. Ex. 3; *see also* Pletzke Dep. 16, Nov. 5, 2012, *attached as* Defs.' Mot. Ex. 2.

Officer Pletzke remembers that "we were dispatched to the address for a possible assault between a father and daughter."  Pletzke Dep. 16; *see also* Pletzke Aff. ¶ 4.  They arrived shortly before 11 pm, parking in the driveway behind a minivan.  *See* Esterhai Dep. 32; *see also* DVD Recording, *attached as* Defs.' Mot. Ex. 5.

As they walked to the door, Officer Esterhai recalls, Plaintiff came outside and stood on his porch.  Esterhai Dep. 32.  A short time later, Plaintiff's daughter also came outside.  Esterhai Dep. 33.

Plaintiff remembers that the encounter began slightly differently.  Tobias Dep. 64.  Plaintiff recollects that the officers knocked on the door and asked to speak with his daughter.  Tobias Dep. 64.  "I says, 'Sure, just a minute.'  I hollered her name, asked her if she called the cops, she said, 'Yeah.'  I said, 'Well, they're here to talk to you.'"  Tobias Dep. 64.

### D

Regardless of how the encounter began, it is undisputed that after the officers arrived both father and daughter came out of the house and stood on the porch.  The daughter then went to talk with Officer Pletzke in the squad car.  Esterhai Dep. 33; Tobias Dep. 65.  Officer Esterhai remained on the porch with Plaintiff.  Esterhai Dep. 34.

**E**

The conversation that Officer Pletzke had with the daughter in the squad car was recorded.  *See* DVD Recording.

Shortly after entering the car, Officer Pletzke can be heard asking "Has everything calmed down inside?"  *Id*. at 31:23–25.  "No," the daughter responds, explaining: "My dad is just going to put on an act for you guys.  And after you leave he is just going to friggin' yell at me again."  *Id*. at 31:26–31:32.

Officer Pletzke asks what happened.  The daughter answers that Plaintiff had demanded to know whether she had used Plaintiff's debit card, which she vociferously denied.  *Id*. at 34:00–34:07.  She tells the officer that Plaintiff then asked about her mother.  "He said, 'So you talked to your mom about arrangements to go and live with her?'  And I was like, "She's working on it.  She's going to call the friend of the court in the morning.'  And he's like, 'Oh, great.  What did you tell your mom?  What did you say to her?'  And I said, 'I just told her everything.  What was going on, how I just wanted to get out of here.'  And he said, 'What did you tell her?  Tell me right now what you said.'"  *Id*. at 34:07–34:28.

"And I told my mom that my dad still used drugs," the daughter relays to Officer Pletzke, continuing: "cause she asked.  And I wasn't going to lie to her.  And my dad got pissed off.  And he started kicking the wall and hitting the wall.  And then he hit me across the face with a pillow and did whatever to my hand."  DVD Recording, at 35:18–35:31.

"Ok — hold on, hold on, I can only write so fast," interrupts Officer Pletzke.  *Id*. at 35:32.  Resuming her narrative seconds later, the daughter starts to cry: "I want to get out of here.  I can't stay here.  Anyway, my brother can't get away with anything.  I can't get away with anything.  And my dad smokes, grows, and sells pot!"  *Id*. at 35:34–35:49.

"Is it in the house right now?" Officer Pletzke asks. *Id*. at 35:50–51. "Yeah," answers the daughter. *Id*. at 35:51. "Where's it at?" asked Officer Pletzke. *Id*. at 35:52. "Upstairs in the bathroom — or his room," responds the daughter. DVD Recording, at 35:52–57.

Officer Pletzke decides to accompany the daughter inside the house. Over the sound of closing car doors, the daughter can be heard repeating "either in the bathroom or his room." *Id*. at 39:41–43. "Oh I can't — I mean is his room open?" Officer Pletzke responds as the two (evidently) stand outside the car. *Id*. at 39:43–45. "His room? Yeah. And the upstairs bathroom," reiterates the daughter. *Id*. at 39:46–48.

"Will your boyfriend's parents come get ya?" Officer Pletzke asks as he walks back to the house with the daughter. DVD Recording, at 40:04–05. "Yes," answers the daughter. *Id*. at 40:06. "They come get ya for the night, I [will] go up and watch you pack a couple of your things," Officer Pletzke can be heard replying (the recording is not altogether clear as the two walk back towards the house). *Id*. at 40:09–40:14.[1]

**F**

Officer Pletzke recalls in his deposition that the daughter "was asking that I stand by while I went up with her to collect some personal belongings and she was going to stay with her boyfriend." Pletzke Dep. 17.

"She wanted to go to a friend's house for the evening," Officer Esterhai similarly recalls in his deposition, explaining that he understood that the daughter wanted to back inside the house "[t]o get some belongings." Esterhai Dep. 35.

---

[1] The recording thus suggests that the idea that the daughter should collect "a couple things" before spending the night at the home of her boyfriend's parents originated with Officer Pletzke, not the daughter herself.

**G**

Returning from the squad car, Officer Pletzke and the daughter met Plaintiff and Officer Esterhai on the porch.  The heart of the dispute — and the case — is about what happened next.

**1**

When Officer Esterhai was asked in in deposition if he agreed "that you and Mr. Pletzke were invited into [Plaintiff's] home?" he responded that "the daughter wanted to be accompanied into the home with an officer."  Esterhai Dep. 21.  Asked if he and Officer Pletzke "were invited into the home by her dad?"  he responded: "I do remember Mr. Tobias saying in reference to having a search warrant to enter his residence."  Esterhai Dep. 22.  Plaintiff's counsel followed up:

> Q:    When [Plaintiff] mentioned something about wanting a search warrant where was Officer Pletzke at that point?
>
> A:    He was outside.
>
> Q:    Had he been in the house yet?
>
> A:    No.
>
> Q:    Tell me the best you can recall about exactly what [Plaintiff] said concerning a search warrant and the officers entering the home?
>
> A:    I don't know the exact words verbatim.  I do recall him stating to the effect of needing a search warrant or having a search warrant to enter his house.

Esterhai Dep. 25.  Later, Officer Esterhai emphasized: "All I remember is that there was a discussion about grabbing her belongings inside the residence and Mr. Tobias had said that we needed a search warrant or a warrant to go inside his house."  Esterhai Dep. 39.

**2**

Officer Pletzke recalls the conversation on the porch differently.  In his deposition, he testified:

> [Plaintiff's] initial answer — his first, initial answer was "no," but after some time — through the course of this conversation he's actually physically standing in the threshold of the door while I was speaking with him.  After the course of the action he allowed me to enter into his house.  He actually physically stepped out of the threshold basically inviting me and letting me enter the residence, walking upstairs to accompany the daughter while she collected some belongings.

Pletzke Dep. 18.  Inquiring further, Plaintiff's counsel asked whether Officer Pletzke "interpreted [Plaintiff's] physical movements as an invitation to come in?"  Pletzke Dep. 18.  "Well," Officer Pletzke responded, "after saying 'yes' and removing himself from the threshold of the doorway of the residence and stepping aside, I interpreted that as an invite to allow me into the residence." Pletzke Dep. 18.

**3**

Plaintiff offers a still another version of what happened on the porch.  In his deposition, he recalled:

> A:      [Officer Pletzke] took his gloves out of his pocket and told me — asked me if I wanted to do this the easy way or the hard way.
>
> Q:      Now, is that a quote?  Or are you summarizing —
>
> A:      No.  That's a question he asked me.

Tobias Dep. 45.  Defendants' counsel inquired further:

> Q:      What was said?
>
> A:      [Officer Pletzke] wanted to escort my daughter up to her room.
>
> Q:      He said something to that effect?
>
> A:      Yes.

Q:      Okay.  And what was your response to that?

A:      That she don't need an escort, you're not coming in my home.

Q:      Okay.  And what was his response to your response?

A:      His response was, "Your daughter is getting an escort up to her room to get her clothes so she can go spend the night at her grandma's."

Q:      So he kind of reiterated in more detail what it was that he thought was going to happen?

A:      Yeah.

Q:      And what did you say?

A:      I told him that, "You're not coming in my home without a fucking warrant."

Q:      Okay.  Were those your exact words?

A:      Yes.

Q:      Okay.  And what was his response to that statement?

A:      His response was that he reached behind his back with both his hands and grabbed his gloves and was putting his gloves on telling me, do I "want to do this the easy way or the hard way?"

Tobias Dep. 66–67.  Plaintiff interpreted this as "[a] threat of violence, that he was going to put his hands on me." Tobias Dep. 100.  Defendants' counsel asked:

Q:      Okay.  And so then what did you say?

A:      I says, you know, still, "You're not coming in my home without a warrant."

Q:      Okay.  And then what did [Officer Pletzke] say?

A:      I believe it was, "Yes, we are."  And my statement was, 'If you want to insist on violating my rights, you go right on ahead."

Q:      And did they go in?

A:      Yes, they did.  Officer Pletzke went in.

Tobias Dep. 68.

**4**

Finally, a fourth version of the events on the porch comes from a recording captured by the microphone that Officer Pletzke was wearing that night.  Approaching the house, Officer Pletzke can be heard speaking to Plaintiff: "Hey John, I understand you told [your daughter] that she's not going to school tomorrow and to start packing her stuff up so she can go live with her mom.  Is that what you told her?"  DVD Recording, at 40:35–44.  "I did," Plaintiff responds.  *Id*. 40:46.

Officer Pletzke then explains that the daughter "will pack a couple things up," spend the night with her boyfriend's parents, and "return tomorrow, pack her stuff up, and go live with her mother.  Do you have a problem with her going and getting a couple things now and get out of here?"  *Id*. at 40:48–41:01.

"Yeah, actually, I do," Plaintiff responds.  *Id*. at 41:08.  Turning his attention to his daughter, Plaintiff says: "You're alright."  *Id*. at 41:11.  "No, I'm not.  You hit me!" the daughter cries out.  DVD Recording, at 41:12–41:13.

"I did not hit you!"  Plaintiff responds.  *Id*. at 41:14.  "John, John, John, hey hey John," Officer Pletzke interjects, before cautioning:

> She don't want to stay here tonight, K?  Alright, she's got marks on her.  So either you let her go tonight to her boyfriend's parents or we'll call CPS to get someone else [inaudible].  Ok?  Her welfare, I don't believe that's being properly taken care of.  So we can either do the easy way or the hard way.  I don't really care.

*Id*. at 41:16–41:36.  "Go pack your couple things," Plaintiff then tells his daughter.  *Id*. at 42:22–42:23.

-11-

"Ok, I'm going to walk up with her and make sure she's packing, alright?" interjects Officer Pletzke.  *Id*. at 42:22–42:25.  "No, she's alright," Plaintiff replies.  *Id*. at 42:25.

"No, he can come up there," interjects the daughter.  *Id*. at 42:27.  "I said he can't," reiterates Plaintiff, directing his daughter: "Go pack your things and get up down here."  *Id*. at 42:31–42:34.  The daughter responds:  "You're just afraid he's going to find your stash, dad."  *Id*. at 42:41.

"Is there something to hide?"  Officer Pletzke then interjects.  *Id*. at 42:43.  "No, I ain't got nothing to hide," answers Plaintiff.  *Id*. at 42:43.  "Then what is the problem with me going up there?" asks Officer Pletzke.  *Id*. at 42:44.  "You don't have a warrant," answers Plaintiff.  *Id*. at 42:45.  "I don't have to have a warrant," responds Officer Pletzke raising his voice, "the welfare of your child is my main priority."  *Id*. at 42:49.  Officer Pletzke then (somewhat ambiguously) continues: "I don't really care."  *Id*. at 42:51.

Raising his own voice, Plaintiff responds: "She's going to get her bag!"  *Id*. at 42:53.  Officer Pletzke then gives Plaintiff a choice: "Either you are going to be seated right here while I go up there or you are going to go in the back of my car while I go up there — which way do you want it?"  *Id*. at 42:53–59.  Plaintiff's response, if any, is not audible on the recording.

"Thank you," Officer Pletzke can be heard saying two seconds later.  *Id*. at 43:01.[2]

### H

Officer Pletzke went inside the house with the daughter.  Plaintiff remained on the porch with Officer Esterhai.

---

[2] As discussed below, a search undertaken several hours later revealed several weapons inside the home. At the time of the conversation on the porch, however, no suggestion that weapons were inside had been made by either the daughter, the officers, or Plaintiff.

**1**

After entering the home, Officer Pletzke recalls, he "proceed[ed] up the stairs following [the daughter] for her safety."  Pletzke Dep. 22.  Plaintiff's counsel inquired:

> Q:  And where was [Plaintiff] at this point?
>
> A:  I believe he is standing outside speaking with Officer [Esterhai], but I cannot recall his exact location. . . .
>
> Q:  And what was it about [the daughter's] safety that was of concern under those circumstances?
>
> A:  Well, according to her statement she had been previously assaulted by her father, possibly assaulted by her father.
>
> Q:  But in terms of being inside the dwelling if [Plaintiff] is outside with Officer Esterhai what is the safety concern?
>
> A:  Safety concern is for the welfare of [the] daughter meaning that, you know, if [Plaintiff] don't [sic] allow us in and he goes in there with her, he could possibly assault her.

Pletzke Dep. 22–23.[3]

"As soon as I enter the residence," Officer Pletzke recounts in his deposition, "I smell a strong odor of marijuana."  Pletzke Dep. 23.  But, he asserts, he did not investigate.  Pletzke Dep. 23.  Instead, Officer Pletzke stood in the hallway outside the daughter's room while she collected some of her belongings.  Pletzke Dep. 23.

While she was doing so, Officer Pletzke further recalls, Plaintiff's son "then comes out of his bedroom and walks over and says something to the point of, 'Officer, you're going to want to take a look at this,' or something like . . . and goes over and opens the bathroom door, revealing a marijuana grow operation."  Pletzke Dep. 23–24.

---

[3] Officer Pletzke does explain how Plaintiff, secured by two police officers on the porch and ordered by Officer Pletzke to either wait "right here" on the porch or "in the back of my car," posed a threat to the daughter's safety inside the house.

**2**

Again, the microphone Officer Pletzke wore that night also recorded these events.  When we last left the recorded version (on the porch), Officer Pletzke was saying to Plaintiff: "Either you are going to be seated right here while I go up there or you are going to go in the back of my car while I go up there — which way do you want it?"  DVD Recording, at 42:53–59.  Two seconds later, "Thank you," Officer Pletzke can be heard saying.  *Id.* at 43:01.

The sounds of footsteps on stairs follow.  The next discernable voice is that of Plaintiff's son, who says: "Um, would you want to take a look in that room?"  *Id.* at 43:19–43:22.  Officer Pletzke exclaims: "Oh, no shit!" yelling out to Officer Esterhai "Lyle, grab him!  Lyle, grab him!"  *Id.* at 43:29–43:34.

**I**

Officer Esterhai was unable to grab Plaintiff, however, before he fled into the night.  Esterhai Dep. 37; Tobias Dep. 72.  Explaining how he evaded the officer, Plaintiff recalled in his deposition: "I yelled, 'Lyle,' and I stuck my finger this far from his nose, and Officer Esterhai went like this and his eyes crossed."  Tobias Dep. 72.  Following up, Defendants' counsel asked:

Q:     What did you do with your finger?

A:     I took my index finger and I pointed it at Lyle Esterhai's face.

Q:     How far away were you?

A:     I was within inches; six inches.

Q:     What was your intent when you did that?

A:     Just to alarm him.

Q:     All right.

A:     Surprise him.

Q:      Okay.  And his reaction you showed me, could you describe it for me?

A:      Was he crossed his arms in front of his face and he crossed his eyes.

Q:      And what did you do — That's when you took off?

A:      I turned and fled.

Tobias Dep. 73.  Explaining why he fled, Plaintiff testified: "I was afraid of altercations.  Instead of making matters worse I thought by removing myself from the situation would make it better." Tobias Dep. 74.   And, although Officer Esterhai gave chase, Plaintiff proved elusive.  *See* Esterhai Dep. 37.

He remembers that he went "in the woods, and I stayed in the woods."  Tobias Dep. 75.

**J**

A canine unit was dispatched, Plaintiff recalls.  Tobias Dep. 75.  Defendants' counsel inquired:

Q:      How did you elude the dog?  Is that the farm boy in you?

A:      That, and I had a dog, myself, that came to me in the woods while I was waiting to see what was going to happen.

Q:      Your dog?

A:      My dog.

Q:      All right.  And did that help you to elude the other dog?

A:      My dog laid down with me . . . and the canine unit came within 10 feet and could smell us and my dog was growling.  The canine unit dog was growling.  I was growling.

Q:      Why were you growling?

A:      Because it seemed to work for my dog . . . .

Q:      All right.  You thought that it would discourage the canine dog from coming there?

-15-

A:      And which it did.

Q:      Okay.  So they didn't apprehend you that night?

A:      That's correct.

Tobias Dep. 75–76.

## K

While Plaintiff was hiding in the woods, Officer Pletzke left to type up a search warrant. Esterhai Dep. 20.  Officer Esterhai remained at the home.  Esterhai Dep. 20.

In the affidavit supporting the search warrant, Officer Pletzke asserted: "During the investigation officers were invited into the home by the 16-year-old caller and her Dad."  Pletzke Aff.¶ 4.

A magistrate judge signed the warrant about 3:45 am on the morning.  *See* Warrant, *attached as* Defs.' Mot. Ex. 9; *see also* Pletzke Dep. 31.

## L

About 4 am, officers executed the warrant.  Among the items seized were: (1) 29 marijuana plants (found in the upstairs bathroom, downstairs bedroom, and outbuilding); (2) two marijuana pipes; (3) one digital scale; (4) one heat lamp; (5) one shotgun;[4] (6) one crossbow; (7) ammunition of different calibers; and (8) a laptop computer.  *See* Crime Sheet Worksheet, *attached as* Pls.' Mot. Ex. 10.

---

[4] Plaintiff, who had six felony convictions, was prohibited from owning firearms.  *See* Tobias Dep. 18–26 (discussing his felony and misdemeanor convictions).

**M**

Plaintiff returned home around 7 am.  Tobias Dep. 78.  A short time later, Officer Pletzke also returned.  Pletzke Dep. 32; Tobias Dep. 82.  Officer Wedding accompanied Officer Pletzke; Officer Esterhai did not.  Pletzke Dep. 32.

Picking up the action as the officers left the car, in Officer Pletzke's deposition Plaintiff's counsel asked:

> Q:     What happened then?
>
> A:     As we were walking up [to] the residence we heard what we thought was a window closing to the back of the residence.  I proceeded around to the rear of the residence and there was a window open and a dog had jumped out of the window and was kind of just scrambling all around, so I just took the initiative and started telling him, "Find him, find him."  And the dog just took off and . . . located [Plaintiff].
>
> Q:     Did you follow the dog?
>
> A:     Yes, sir.
>
> Q:     All right.  Where was [Plaintiff]?
>
> A:     He was down in a ditch.

Pletzke Dep. 32.  Plaintiff explains that he was in the ditch when he spied the officers; he decided not to elude them again because "[t]hey threatened to shoot me."  Tobias Dep. 87.

**N**

Plaintiff was arrested and charged with: (1) manufacturing marijuana; (2) felon in possession of a firearm; (3) felony firearm; (4) resisting and obstructing an officer; and (5) domestic violence.  *See* State's Request for Dismissal of Criminal Complaint, *State v. Tobias*, No. 08-FY-10944 (Bay Cnty. Dist. Ct. Oct. 9, 2008), *attached as* Pls.' Resp. Ex. 4.

He was arraigned the following day and permitted to post bond.  Tobias Dep. 89–90.  Fourteen days later, the prosecutor dropped the charges against Plaintiff.  *See* Order Granting

State's Request for Dismissal of Criminal Complaint, *State v. Tobias*, No. 08-FY-10944 (Bay Cnty. Dist. Ct. Oct. 9, 2008), *attached as* Pls.' Resp. Ex. 4; *see also* Tobias Dep. 91.

About three years passed. Then this litigation began.

**O**

In 2011, Plaintiff filed a seven-count complaint against Defendants in the Bay County Circuit Court. The first five counts raise civil rights claims pursuant to 42 U.S.C. § 1983. The sixth alleges a state law trespass claim. And the seventh seeks punitive damages.

Specifically, count one alleges that Defendants violated Plaintiff's Fourth Amendment rights by entering Plaintiff's home without a warrant. Count two alleges that Defendants violated Plaintiff's rights by Officer Pletzke swearing out an affidavit for a search warrant containing a deliberately false statement. Count three alleges that Defendants violated Plaintiff's rights by unreasonably seizing "non-contraband property." Count four alleges that Defendants violated Plaintiff's rights by maliciously prosecuting him. Count five alleges that Defendants violated Plaintiff's Fourteenth Amendment substantive due process rights by Officer Pletzke completing a false affidavit. Count six alleges a state law claim of trespass to chattels. And count seven alleges that Defendants' intentional misconduct entitles Plaintiff to punitive damages.

Defendants were served with copies of the complaint on February 2, 2012. On February 22, 2012, they removed the case to this Court. They now move for summary judgment.

**II**

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look

in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III

Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983.

Here, as noted, Plaintiff's § 1983 claims assert that he was deprived of his constitutional rights under the Fourth and Fourteenth Amendments.

### A

Specifically, count one asserts that Defendants violated Plaintiff's Fourth Amendment rights by entering Plaintiff's home without a warrant.

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV.

The text of the amendment thus expressly requires two things.  All searches and seizures must be reasonable.  And all warrants must be based on probable cause established by a sworn statement.

The Supreme Court has, "of course, repeatedly held that warrantless searches are presumptively unreasonable."  *United States v. Leon*, 468 U.S. 897, 960 (1984) (Brennan, J., dissenting) (collecting cases).  Yet not all searches require a warrant.  Rather, "the presumption in practice works in exactly the opposite direction.  Indeed, with some, although only some, exaggeration, the current state of the law seems to be that warrants are required only for residential searches."  Craig S. Lerner, *The Reasonableness of Probable Cause*, 81 Tex. L. Rev. 951, 955 (2003) (footnote omitted) (collecting cases); *see California v. Acevedo*, 500 U.S. 565, 585 (1991) (Scalia, J., concurring) (enumerating 22 exceptions to the warrant requirement as of 1991).  The home, however, has retained this powerful presumption.

As interpreted by the Supreme Court, "the Fourth Amendment has drawn a firm line at the entrance to the house."  *Payton v. New York*, 445 U.S. 573, 590 (1980).  (More precisely, the Court itself has drawn a firmer line at the entrance to the home than elsewhere.)  "Since we hold to the centuries-old principle of respect for the privacy of the home," the Court explains, "it is beyond dispute that the home is entitled to special protection as the center of the private lives of our people."  *Georgia v. Randolph*, 547 U.S. 103, 115 (2006) (2006).  (internal citation and quotation marks omitted) (quoting *Wilson v. Layne*, 526 U.S. 603, 610 (1999); *Minnesota v. Carter*, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring)); *see also Kentucky v. King*, 131 S. Ct. 1849, 18651 (2011) (Ginsburg, J., dissenting) ("In no quarter does the Fourth Amendment apply with greater force than in our homes, our most private space which, for centuries, has been

regarded as entitled to special protection."  (quotation marks omitted) (quoting *Randolph*, 547 U.S. at 115 & n.4).

"Nevertheless," even in the home, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City*, 547 U.S. at 403 (citing *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (per curiam); *Katz v. United States*, 389 U.S. 347, 357 (1967)).

Here, Defendants did not obtain a warrant before Officer Pletzke entered Plaintiff's home with the daughter.  But, Defendants assert, the entry was permissible pursuant to two exceptions to the warrant requirement: consent and exigent circumstances.

**1**

**a**

It is "well settled," the Supreme Court observed 40 years ago, "that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citing *Davis v. United States*, 328 U.S. 582, 593–594 (1946); *Zap v. United States*, 328 U.S. 624, 630 (1946)).  But, the Court cautions, a party who "seeks to rely upon consent to justify the lawfulness of a search . . . has the burden of proving that the consent was, in fact, freely and voluntarily given."  *Schneckloth*, 412 U.S. at 222 (quotation marks omitted) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)).

Here, Defendants assert that Plaintiff himself consented to the search of the home. Officer Pletzke, as noted, said as much in his deposition.  *See* Pletzke Dep. 18 (quoted above). But Officer Esterhai contradicted this in his deposition.  *See* Esterhai Dep. 22, 25, 39 (quoted above).  As did Plaintiff.  *See* Tobias Dep. 66–68 (quoted above).  And the audio recording is

also in considerable tension with Officer Pletzke's version.  *See* DVD Recording, at 42:44–43:59

(quoted above).  A genuine dispute as to this material fact exists.

Similarly unavailing is Defendants' reliance on the consent of Plaintiff's daughter, the

issue taken up next.

**b**

Of more recent vintage, but now also firmly established, are two related, "complementary

rules, one recognizing the [constitutional sufficiency of a co-occupant's consent to enter a

residence] when there is no fellow occupant on hand, the other according dispositive weight to

the fellow occupant's contrary indication when he expresses it."  *Georgia v. Randolph*, 547 U.S.

103, 121–22 (2006).

The specific issue in *Randolph* was whether the consent of one co-occupant of a home

remains effective in the face of an express objection by another co-occupant.  *Id*. at 106.  Before

reaching this question, the Court first noted that all the federal courts of appeals "to have

considered this question ha[d] concluded that consent remains effective in the face of an express

objection." *Id*. at 108 n.1.  But in a 5–3 decision,[5] the Supreme Court overruled these lower

court decisions.  "We hold," Justice Souter wrote for the majority, "a physically present co-

occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable

and invalid as to him."  *Id*. at 106.  Resting the rule on "customary social understanding," *id*. at

121, Justice Souter explained: "Since the co-tenant wishing to open the door to a third party has

no recognized authority in law or social practice to prevail over a present and objecting co-

tenant, his disputed invitation, without more, gives a police officer no better claim to

---

[5] Justice Souter's majority opinion was joined by Justices Stevens, Kennedy, Ginsburg, and Breyer. Justices Stevens and Breyer also each wrote concurring opinions.  Chief Justice Roberts's dissenting opinion was joined by Justice Scalia. Justice Thomas also wrote a dissenting opinion.  Justice Alito took no part in the consideration or decision of the case.

reasonableness in entering than the officer would have in the absence of any consent at all." *Id.* at 114.[6]  "This is the line we draw," Justice Souter concluded, "and we think the formalism is justified." *Id.* at 121.[7]

Here, Defendants assert that Plaintiff's daughter consented to Officer Pletzke's entry, rendering it lawful.  *See* Defs.' Br. 10–11.  In support, they rely on a Sixth Circuit decision, *J.L. Foti Construction Co. v. Donovan*, 786 F.2d 714 (6th Cir. 1986).  *J.L. Foti*, however, predates *Randolph*.  And not only is *Randolph* directly contrary, since it was decided the Sixth Circuit has expressly recognized that *Randolph* overruled *Donovan*.  *See Johnson v. Weaver*, 248 F. App'x 694, 699 (6th Cir. 2007).

Defendants are thus correct that the undisputed evidence is that Plaintiff's daughter consented to the entry.  But Plaintiff did not — in fact, he objected to the entry.[8]  Defendants' reliance on the consent of Plaintiff's daughter, like their reliance on *J.L. Foti*, is misplaced.  The entry was not justified by consent.

## 2

Warrantless entries into the home are also permitted if "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively

---

[6] Justice Souter cautioned that a similar result may not obtain if "the people living together fall within some recognized hierarchy, like a household of parent and child."  547 U.S. at 114.  Under those circumstances, presumably, a parent could overrule the consent of a child — but not vice-versa.  This dictum, of course, makes this an easier case than *Randolf*, where the question was whether a wife's consent could overrule her husband's objection.

[7] Dictum in the Court's decision regarding "the authority of the police to enter a dwelling to protect a resident from domestic violence" will be addressed in the exigent circumstances discussion that follows.

[8] At least drawing all reasonable factual inferences in his favor, as the Court must on Defendants' summary judgment motion.

reasonable under the Fourth Amendment." *Brigham City*, 547 U.S. at 403 (quotation marks omitted) (quoting *Mincey v. Arizona,* 437 U.S. 385, 393–94 (1978)).[9]

"Exigent circumstances," the Sixth Circuit explains, "are situations where real immediate and serious consequences will certainly occur if a police officer postpones action to obtain a warrant." *United States v. Williams*, 354 F.3d 497, 503 (6th Cir. 2003) (quotation marks omitted) (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002)); *but see Brigham City*, 547 U.S. at 406 ("The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties; an officer is not like a boxing (or hockey) referee, poised to stop a bout only if it becomes too one-sided.").

As a general matter, "the determination of exigent circumstances is normally a question for the jury," unless "a finder of fact could reach but one conclusion as to the existence of exigent circumstances . . . as a matter of law." *Ewolski*, 287 F.3d at 501 (quoting *Hancock v. Dodson*, 958 F.2d at 1375). And like consent, "the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984) (citing *Payton*, 445 U.S. at 586).

The Sixth Circuit recognizes four types of "exigent circumstances" that may justify a warrantless entry into the home: "(1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) the need to prevent a suspect's escape; and (4) a risk of danger to the police or

---

[9] The test, as noted, is objective: "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify the action." *Brigham City*, 547 U.S. at 404 (bracket and quotation marks omitted) (emphasis in original) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)).

others." *United States v. Williams*, 354 F.3d 497, 503 (6th Cir. 2003) (quoting *United States v. Johnson,* 22 F.3d 674, 680 (6th Cir. 1994)).[10]

Here, the only potentially applicable category is the fourth.

**a**

Discussing this type of exigent circumstance, the Supreme Court instructs that "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey*, 437 U.S. at 392; *Michigan v. Fisher*, 130 S. Ct. 546, 548 (2009) (discussing the "emergency aid" exigency that "requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid" (quotation marks, brackets, and citation omitted) (quoting *Brigham City*, 547 U.S. at 404–05; *Mincey*, 437 U.S. at 392).

The police thus have an "undoubted right" to enter a home to keep a person within safe from harm. *Randolph*, 547 U.S. at 118–19 (dictum). Moreover, given "the combustible nature of domestic disputes" in particular, courts "have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger." *Tierney v. Davidson*, 133 F.3d 189, 197 (2d Cir. 1998) (collecting cases);[11] *but see United States v. Davis*, 290 F.3d 1239, 1244 (10th Cir. 2002) (declining government's invitation to create "a special rule for domestic calls

---

[10] *But see generally* Amanda Jane Proctor, *Breaking into the Marital Home to Break Up Domestic Violence: Fourth Amendment Analysis of "Disputed Permission"*, 17 Am. U. J. Gender Soc. Pol'y & L. 139, 152 (2009) ("In an interesting development, *Randolph*, a third-party consent case, has spawned decisions citing 'community caretaking functions' as a potential exigency justifying a warrantless police entry into a home to protect a domestic violence victim as she retrieves her belongings.").

[11] *See generally* Deborah Tuerkheimer, *Exigency*, 49 Ariz. L. Rev. 801, 835 (2007) ("[J]udges deciding challenges to warrantless police conduct have been generally inclined to accept that domestic violence is different from paradigmatic violence.").

because they are inherently violent, and the police, responding to theses calls, are automatically at greater risk").

Crucially, however, as the Supreme Court cautions: "The exigent-circumstances exception is narrowly drawn to cover cases of real and not contrived emergencies." *Welsh v. Wisconsin*, 466 U.S. 740, 752 (1984) (brackets omitted) (quoting *State v. Guertin*, 461 A.2d 963, 970 (Conn. 1983)). Officers thus have an indisputable right "to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists." *Randolph*, 547 U.S. at 118. But if officers do not have reason to believe that a threat exists inside the home, the officers do not have the right to enter. *E.g.*, *Davis*, 290 F.3d at 1244.

No imminent threat, no justification for a warrantless entry. *E.g.*, *United States v. Tatman*, 615 F. Supp. 2d 664, 679 (S.D. Ohio 2008) ("In this case, Taresa Tatman, the alleged victim, was in no immediate danger. In fact, she was safely outside the house with two police officers. Under these circumstances, no exigent circumstances exist and a warrantless entry is simply not justified."), *aff'd,* 397 F. App'x 152 (6th Cir. 2010).

Here, when Officer Pletzke announced his intent to escort the daughter inside, no reasonable officer would think that a there was a threat to the daughter's safety inside. There was no reason to think so.

Plaintiff was outside on the porch, secured by two police officers. And Officer Pletzke himself gave Plaintiff a direct order to stay there. DVD Recording at 42:53–59. "Either you are going to be seated right here while I go up there or you are going to go in the back of my car while I go up there," Officer Pletzke informed Plaintiff as Officer Esterhai stood by. *Id*.

Moreover, viewing the facts in the light most favorable to Plaintiff, no reasonable officer would think that Plaintiff posed an imminent threat to his daughter's safety outside the home,

much less inside it.[12]  As noted, he was on the porch, secured by two police officers.  And while he was steadfastly asserting his Fourth Amendment rights, he was not behaving threateningly towards the officers or the daughter.  Under the circumstances, no reasonable officer would conclude that a police escort was necessary to protect the daughter as she went to grab a couple things from inside her own house.

The exigent circumstances exception does not justify Officer Pletzke's warrantless entry.

**b**

Arguing against this conclusion, Defendants write: "In *Georgia v. Randolph*, 547 U.S. 103 (2006), the Supreme Court held that where cohabitants of the home differ as to whether to provide consent, law enforcement may ignore the refusal to enter if made by a suspected physical abuser."  Defs.' Br. 13.  "Therefore," Defendants conclude, "Officer Pletzke's entry into the home was justified under the exigent circumstances exception to the Fourth Amendment as referenced in *Randolph*."  Id. at 14.

Contrary to Defendants' assertion, *Randolph* does not establish a new categorical rule that police may always "ignore the refusal to enter if made by a suspected physical abuser." Rather, as noted, *Randolph* simply expounds on the traditional rule that police may enter a home (even over an occupant's objection) "to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists."  *Randolph*, 547 U.S. at 118; *see e.g.*, *Mincey v. Arizona*, 437 U.S. 385, 392 (1978) ("The need to protect or preserve life or avoid

---

[12] In passing, it should be noted that even if the officers had reason to believe that Plaintiff actually posed an imminent threat to his daughter's safety (which, drawing all reasonable inferences in Plaintiff's favor, he did not), they would still not be entitled to rely on the exigent circumstances exception.  Prior to the warrantless entry, the daughter's safety had been secured.  She had been removed from the purported threat, her father, to the security of the officers' vehicle.  If there was reason to believe that her father continued to pose a threat to her safety, Officer Pletzke's decision to walk the daughter back inside would have "essentially created the dangerous situation himself. Law enforcement officers cannot manufacture exigent circumstances."  *United States v. Williams*, 354 F.3d 497, 504 (6th Cir. 2003).

serious injury is justification for what would be otherwise illegal absent an exigency or emergency.").

The point is straightforward. As noted, the police have an "undoubted right . . . to enter in order to protect a victim." *Randolph*, 547 U.S. at 118–19; *see also Brigham City*, 547 U.S. at 403 ("[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."). And by extension, "so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely." *Randolph*, 547 U.S. at 118. But the necessary predicate— the exigency — is "good reason to believe . . . a threat exists." *Id.*

Here, as noted, the officers did not have reason to believe that a threat to the daughter's safety existed inside the house. Her father had been secured by the police outside the home. He was not behaving threateningly. He did not pose an imminent threat to his daughter's safety outside the home — much less inside it.

Moreover, he had been given a choice by the officers: either sit on the porch while his daughter went inside or sit in the back of the squad car. Going inside with his daughter wasn't an option. Under the circumstances, no reasonable officer (indeed, no reasonable person) would conclude that the police escort was necessary to protect the daughter.

### c

Arguing in the alternative, Defendants write that even if the warrantless entry violated Plaintiff's rights, Defendants are entitled to qualified immunity. Defs.' Br. 17. In support of their argument, they rely on *Ryburn v. Huff*, 132 S. Ct. 987 (2012) (per curiam), in which the

Court wrote that "the Fourth Amendment permits an officer to enter a residence if the officer has a reasonable basis for concluding that there is an imminent threat of violence." *Id*. at 990.

Contrary to Defendants' assertion, they are not entitled to qualified immunity. That doctrine provides that government officials, such as police officers, who are "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citing *Procunier v. Navarette*, 434 U.S. 555, 565 (1978); *Wood v. Strickland*, 420 U.S. 308, 322 (1975)).

In resolving questions of qualified immunity, courts must perform a two-step analysis. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, a court should determine whether the facts show "the officer's conduct violated a constitutional right." *Id.* Second, the court must consider "whether the right was clearly established." *Id*.

"For a right to be clearly established," the Sixth Circuit instructs, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992)). While it is not necessary to establish that "the very action in question has been previously held unlawful, in the light of pre-existing law the unlawfulness must be apparent." *Feathers*, 319 F.3d at 848 (quoting *Russo*, 953 F.2d at 1042).

"The relevant question" in the Fourth Amendment context "is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the officer's] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). On summary judgment, as noted,

"all evidence must be construed in the light most favorable to the party opposing summary judgment." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 601 (1986).

Here, for reasons discussed above, Officer Pletzke's warrantless entry violated Plaintiff's Fourth Amendment rights. And that right was clearly established. As noted, "the Fourth Amendment has drawn a firm line at the entrance to the house." *Payton*, 445 U.S. at 590. While officers may cross that line to protect against an imminent threat of harm, absent reason to believe that a threat exists the entry is unlawful. And viewing the facts in the light most favorable to Plaintiff, he did not pose an imminent threat to his daughter's safety inside the house. As noted, he was outside, secured by two officers. He was not acting aggressively or threateningly towards the officers or his daughter. Under the circumstances, a reasonable officer would not have believed that the warrantless entry was justified by exigent circumstances.

*Ryburn* reinforces this conclusion. There, officers received a report of a student "threatening to 'shoot up' the school." 132 S. Ct. at 988. After investigating, the officers found the threat credible. *Id*. The officers went to the student's home. *Id*. They knocked; no one answered. *Id*. They called and the mother answered. *Id*. She said that she was inside with her son, but then hung up. *Id*. Mother and son came outside minutes later, but refused the officers' request to interview the son inside. *Id*. When the officers asked whether there were guns in the house, the mother "responded by immediately turning around and running into the house." *Id*. at 989 (quotation marks and brackets omitted). The son followed, as did the officers. *Id*. The mother and son later brought a § 1983 alleging that the officers had violated the Fourth Amendment by entering the home without a warrant. *Id*.

The Supreme Court concluded that the officers were entitled to qualified immunity, finding that "reasonable officers in the position of petitioners could have come to the conclusion

that there was an imminent threat to their safety and to the safety of others." Id. at 991. The Court explained: "Judged from the proper perspective of a reasonable officer forced to make a split-second decision in response to a rapidly unfolding chain of events that culminated with Mrs. Huff turning and running into the house after refusing to answer a question about guns, petitioners' belief that entry was necessary to avoid injury to themselves or others was imminently reasonable." Id. at 992.

Here, no rapidly unfolding chain of events would lead a reasonable officer to believe that entry was necessary to avoid injury to himself or others. Plaintiff was standing outside, secured by two police officers. He did not pose an imminent threat.[13] Given these facts, no reasonable person would conclude that a police escort was necessary to protect the daughter as she went to grab a couple things from inside her own house. There was no identified threat in the house.

Defendants are not entitled to qualified immunity on count one of the complaint.[14] Nor are they entitled to summary judgment on this count.

**B**

Count two asserts that Officer Pletzke violated Plaintiff's rights by producing an affidavit supporting a search warrant containing a deliberately false statement (that Plaintiff consented to Officer Pletzke's entry). And count two asserts that Officer Esterhai violated Plaintiff's rights

---

[13] As noted, even if there had been reason to believe that Plaintiff actually posed an imminent threat to his daughter's safety — which, drawing all inferences in his favor on Defendants' motion, Plaintiff did not — the officers would still not be entitled to summary judgment. Prior to the warrantless entry, the daughter's safety had been secured. She was safe in the squad car. Only by walking her back to the house would the daughter be placed in danger. The law is settled that "[l]aw enforcement officers cannot manufacture exigent circumstances." Williams, 354 F.3d at 504; see also United States v. Martinez, 406 F.3d 1160, 1164 (9th Cir. 2005) (holding that exigent circumstances did not authorize warrantless entry when officer responded to domestic violence report and domestic violence victim was out front of the home).

[14] This is not to suggest that Defendants will not ultimately be able to demonstrate that the warrantless entry was justified under the circumstances. That, presumably, will ultimately be a question for the fact-finder. But, viewing the facts in the light most favorable to Plaintiff, as this Court must on Defendants' motion, at present they have not demonstrated that they had reason to believe that a threat to the daughter's safety existed inside the home.

when he did not "prevent Defendant Pletzke from unlawfully searching Plaintiff's home." Compl. ¶ 40.

**1**

The Fourth Amendment, as noted, requires that warrants be issued only upon a showing of probable cause supported by a sworn statement.

In general, officers are "entitled to rely on a judicially secured warrant for immunity from a § 1983 action for illegal search and seizure." *Yancey v. Carroll Cnty., Ky.*, 876 F.2d 1238, 1243 (6th Cir. 1989) (citing *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986). But again, this immunity is not absolute. It is qualified.

For example, "an officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant." *Yancey*, 876 F.2d at 1243 (citing *Donta v. Hooper*, 774 F.2d 716, 718-19 (6th Cir. 1985); *U.S. v. Mankani*, 738 F.2d 538, 545 (2nd Cir. 1984)); *see Donta*, 774 F.2d at 718 (observing that "law enforcement officers are not liable for their actions in executing a search warrant that was obtained by making negligent statements or omissions of fact to the issuing magistrate").

Consequently, an officer "may be held liable under § 1983 for making material false statements either knowingly or in reckless disregard for the truth to establish probable cause." *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003) (citing *Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir. 1999)).

To hold an officer liable under § 1983 for making material false statements in a warrant, a plaintiff must therefore establish: "(1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or

-32-

omitted information was material to the finding of probable cause." *Vakilian*, 335 F.3d at 517 (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)).

Finally, the Sixth Circuit cautions, "a determination of whether there was probable cause for a search which gave rise to a § 1983 action is a question to be determined by a jury unless there is only one reasonable determination." *Yancey*, 876 F.2d at 1243 (collecting cases).

Here, Officer Pletzke's affidavit provides: "During the investigation officers were invited into the home by the 16-year-old caller and her Dad." Pletzke Aff.¶ 4. A reasonable juror could conclude that this affidavit contains either a deliberate falsehood or a reckless disregard for the truth. As noted, Officer Pletzke said that Plaintiff consented to the search of the home. *See* Pletzke Dep. 18 (quoted above). But Officer Esterhai did not corroborate this. *See* Esterhai Dep. 22, 25, 39 (quoted above). And Plaintiff flatly contradicted it. *See* Tobias Dep. 66–68 (quoted above). The audio recording is likewise in tension with Officer Pletzke's account. *See* DVD Recording, at 42:44–43:59 (quoted above). Drawing all reasonable inferences in Plaintiff's favor, Plaintiff establishes the first element against Officer Pletzke.

And he establishes the second. As detailed above, when the facts are viewed in the light most favorable to Plaintiff, he objected to the search. Had Officer Pletzke's affidavit accurately reported this, the consent of Plaintiff's daughter would have been insufficient to justify the entry. *See Randolph*, 547 U.S. at 106 (discussed above).[15] As the initial entry was unlawful, Officer Pletzke was not properly in a position to discover the incriminating evidence (Plaintiff's

---

[15] As an aside, it should be noted that Officer Pletzke's affidavit does not assert that exigent circumstances justified the entry.

marijuana cultivation operation) that supported the probable cause determination.  *See* Pletzke Aff.¶ 4.[16]

Officer Pletzke is not entitled to qualified immunity on count two of the complaint.  Nor is he entitled to summary judgment on this count.

Officer Esterhai, in contrast, is entitled to judgment on this count because there is no evidence that he was aware of the allegedly false statement in the warrant, much less participated in its creation.

**2**

Against the conclusion that Officer Pletzke may be held liable, Defendants write that Plaintiff's daughter "provided consent for Officer Pletzke to enter the home.  The affidavit in support of the search warrant clearly articulated that the daughter had provided consent. Therefore, even assuming for sake of argument that Plaintiff did not provide consent . . . because Plaintiff's consent was not needed to obtain the warrant, Plaintiff cannot recover based on this alleged lie."  Defs.' Br. 15.

For reasons discussed above, Defendants' argument lacks merit.  Briefly, as noted, *Randolph* instructs that "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him."  547 U.S. at 106.

Had Officer Pletzke's affidavit reported Plaintiff's express objection, no finding of probable cause could have been made.  Officer Pletzke is entitled to neither qualified immunity nor summary judgment on count two.

---

[16] The affidavit makes no mention of the statements that Plaintiff's daughter made to Officer Pletzke prior to his entry into the home.

**C**

Count three of the complaint asserts that Defendants violated Plaintiff's Fourth Amendment rights by unreasonably seizing "non-contraband property."

Defendants do not expressly address this claim in their motion for summary judgment.[17] Instead, they proceed directly to count four.

**D**

Count four of the complaint asserts that Defendants violated Plaintiff's rights by maliciously prosecuting him.

**1**

The "tort of malicious prosecution," the Sixth Circuit instructs, is "a separate constitutionally cognizable claim . . . under the Fourth Amendment," which "remedies detention accompanied not by absence of legal process, but by wrongful institution of legal process." *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (quotation marks and emphasis omitted) (quoting *Wallace v. Kato*, 549 U.S. 384, 390 (2007); *Barnes v. Wright*, 449 F.3d 709, 715-16 (6th Cir. 2006)).

A malicious prosecution claim has four elements. *Sykes*, 625 F.3d at 308–09. The first is "that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute." *Sykes*, 625 F.3d at 308 (quotation marks and brackets omitted) (quoting *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007)). The second is "that there was a lack of probable cause for the criminal prosecution." *Sykes*, 625 F.3d at 308 (citing *Fox*, 489 F.3d at 237). The third is that "as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty, as understood in our Fourth Amendment jurisprudence,

---

[17] To the extent that Defendants implicitly reassert that they are entitled to judgment on this count because their searches and seizures were lawful, for reasons discussed above their assertion lacks merit.

apart from the initial seizure." *Sykes*, 625 F.3d at 308-09 (quotation marks omitted) (quoting *Johnson v. Knorr*, 477 F.3d 75, 81 (3d Cir. 2007)).   And the fourth is that "the criminal proceeding [was] resolved in the plaintiff's favor." *Sykes*, 625 F.3d at 309 (6th Cir. 2010) (citing *Heck v. Humphrey*, 512 U.S. 477, 484 (1994)).

Here, Plaintiff offers no evidence supporting the first element — that Defendants "made, influenced, or participated in the decision to prosecute." *Sykes*, 625 F.3d at 308 (quotation marks and brackets omitted) (quoting *Fox*, 489 F.3d at 237).   "To be liable for 'participating' in the decision to prosecute," the Sixth Circuit cautions, "the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating." *Sykes*, 625 F.3d at 309 n.5.

In *Skousen v. Brighton High School*, 305 F.3d 520 (6th Cir. 2002), for example, the Sixth Circuit concluded that the officer could not be held liable for malicious prosecution, observing: "There is no evidence that he made or even was consulted with regard to the decision to prosecute." *Id.* at 529; *see also McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th Cir. 2005) ("*Skousen*, in which the plaintiff alleged that a police officer had falsely accused her, clearly forecloses a malicious prosecution claim based solely on officers' turning over evidence to the prosecuting authorities.").

As in *Skousen*, Plaintiff has offered no evidence that Defendants were even consulted with regard to the decision to prosecute.

Defendants are entitled to summary judgment on count four.

**2**

Against this conclusion, Plaintiff writes: "Defendant Pletzke admitted at his deposition that he arrested Plaintiff on the marijuana charge and therefore started the prosecution."   Pl.'s

Resp. 14.  Plaintiff offers no authority, however, for his assertion that simply arresting a suspect

is sufficient to establish that the officer "participated" in the prosecution.

   The Sixth Circuit, moreover, requires a greater showing.  *E.g., Sykes*, 625 F.3d at 314–16;

*cf. Gregory v. City of Louisville*, 444 F.3d 725, 79–60 (6th Cir. 2006).  In *Sykes*, for example, the

plaintiffs asserted:

> [I]t certainly was Sgt. Anderson's arrest that started the chain of events that
> ultimately led to the prosecutor's decision to proceed with the criminal charges
> against the Plaintiffs.  Looking at causation more narrowly, Sgt. Anderson
> reasonably could have foreseen that by providing false information to the
> prosecutor that bore directly on whether there was probable cause to believe that
> the Plaintiffs committed a crime, his misconduct could result in not only the
> Plaintiffs' initial seizure but also their eventual incarceration.

*Sykes*, 625 F.3d at 314–15 (footnote omitted).  The Sixth Circuit rejected the plaintiffs' assertion,

cautioning:

> [I]n order to show that Sgt. Anderson participated in or that his actions influenced
> the commencement of criminal proceedings as required to sustain a claim of
> malicious prosecution, the Plaintiffs were required to present some evidence that
> the impact of Sgt. Anderson's misstatements and falsehoods in his investigatory
> materials extended beyond the Plaintiffs' initial arrest and ultimately influenced
> the Plaintiffs' continued detention.

*Id*. at 315.  Here, as in *Sykes*, Plaintiff has not made this showing.  Defendant is entitled to

summary judgment on count four.

### E

   Count five asserts that Officer Pletzke violated Plaintiff's Fourteenth Amendment

substantive due process rights by completing a false affidavit.

### 1

   "No state," the Due Process Clause of the Fourteenth Amendment provides, "[shall]

deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend.

XIV, § 2.  From the text, it is not immediately obvious that the protected "due process of law" includes substantive rights.[18]

Notwithstanding "the distinctly procedural cast of the clause's language," however, "there is a reasonable historical argument that, by 1868 [when the Fourteenth Amendment was enacted], a recognized meaning of the qualifying phrase 'of law' was substantive."  Lawrence Tribe, *American Constitutional Law* § 8–1, at 1332–33 (3d ed. 2000) (emphasis omitted).

Writing in *Hurtado v. California*, 110 U.S. 516 (1884), for example, the Court held that "due process of law" incorporates substantive rights because "law" requires more than bicameralism and presentment — it requires the reasoned exercise of authority:

> Law is something more than mere will exerted as an act of power. . . .  It must be not a special rule for a particular person or a particular case, but, in the language of Mr. Webster, in his familiar definition, "the general law, a law which hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial," so "that every citizen shall hold his life, liberty, property, and immunities under the protection of the general rules which govern society," and thus excluding, as not due process of law, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man's estate to another, legislative judgments and decrees, and other similar special, partial, and arbitrary exertions of power under the forms of legislation.  Arbitrary power, enforcing its edicts to the injury of the persons and property of its subjects, is not law, whether manifested as the decree of a personal monarch or of an impersonal multitude.

*Id*. at 535–36.  Circumscribing the scope of "substantive due process," however, the Court has since concluded that "where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process."  *Conn v. Gabbert*,

---

[18] *See generally* John Hart Ely, *Democracy and Distrust* 18 (1980) (writing that " 'substantive due process' is a contradiction in terms — sort of like 'green pastel redness' "), *quoted in* Lawrence Tribe, *American Constitutional Law* § 8–1, at 1333 (3d ed. 2000); *but see generally* Charles L. Black, Jr., *A New Birth of Freedom: Human Rights, Named and Unnamed* 92 (1997) (writing that substantive due process "resembles a Zen Buddhist *Koan*, a saying that expresses or asks for the impossible, even the unimaginable, in order to tease or stimulate or press the mind or the spirit into a transcendent reality"), *quoted in* Tribe, *supra*, at 1333 n.7.

526 U.S. 286, 293 (1999) (quotation marks omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

Here, as noted, Plaintiff's substantive due process claim arises out of his allegation that Officer Pletzke completed a false affidavit in support of the search warrant. This affidavit was expressly required by the text of the Fourth Amendment. Given the explicit textual source of the constitutional protection, Plaintiff's challenge to the affidavit falls under the Fourth Amendment, and not the Fourteenth. *See Conn*, 526 U.S. at 293; *Albright v. Oliver,* 510 U.S. 266, 269–71 (1994) (holding that a person alleging that he was prosecuted in the absence of probable cause does not state a substantive due process claim since such a claim must be judged under the Fourth Amendment).

Defendants are entitled to summary judgment on count five.

## 2

Plaintiff, for his part, acknowledges "that if a claim under § 1983 is redressable under a specific textual section of the constitution then the claim is limited to that constitutional provision." Pl.'s Resp. 15. But, Plaintiff asserts: "To the extent Defendants claim that Plaintiff is complaining again of either search in the due process count, they are mistaken. The separate act of making an ex parte false and misleading statement to the magistrate is the basis of this claim." *Id*. As framed by Plaintiff, however, this claim does not allege an injury.

If Officer Pletzke's allegedly false affidavit is wholly separated from its consequences, it did not affect Plaintiff. The Supreme Court cautions that "the abstract value of a constitutional right may not form the basis for § 1983 damages." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 (1986); *see also Clewis v. Anderson Cnty. Comm'r's Ct.*, 62 F.3d 392 (5th Cir. 1995) (per curiam) ("A 42 U.S.C. § 1983 cause of action requires an injury.").

But if Officer Pletzke's allegedly false affidavit is tied to its consequences — specifically, those that allegedly harmed Plaintiff — the claim arises under the Fourth Amendment, not the Fourteenth.

Defendants are entitled to summary judgment on count five.

**F**

Count six asserts a state law claim of trespass to chattels (specifically, the seizure of Plaintiff's non-contraband property, such as the laptop computer, incident to the search).

**1**

"The gist of trespass to personalty, also known as trespass to chattels, is an injury to, or interference with, possession, unlawfully, with or without the exercise of physical force." 2 Linda Miller Atkinson et al., *Torts: Michigan Law and Practice* § 13.53 (ICLE 2011 supp.) (quotation marks omitted) (quoting 22 *Michigan Law and Practice* 178 (1958)).

In general, however, such a trespass is privileged "when the trespasser acts pursuant to a facially valid court order." *Mackie v. Bollore S.A.*, No. 286461, 2010 WL 673295, at *4 (Mich. Ct. App. Feb. 25, 2010) (per curiam) (citing *Restatement (Second) of Torts* § 266 (1965)).

The traditional exception to this rule, however, is that an officer's "knowing, intentional, or reckless omission or fabrication of material information in the [warrant] application would invalidate the warrant and generate tort liability for the [officer]." *Dirienzo v. United States*, 690 F. Supp. 1149, 1154 (D. Conn. 1988) (applying New York law); *cf. Guerro v. Mulhearn*, 498 F.2d 1249, 1256 (1st Cir.1974) (holding that a facially valid search warrant did not immunize officers because it was "allegedly obtained by the defendants in bad faith and on the basis of perjured testimony"); *Benjamin v. United States*, 554 F. Supp. 82, 86 (E.D.N.Y. 1982) ("While it is of course true that the police cannot insulate themselves from liability for false arrest by

obtaining a warrant with perjurious affidavits, only intentional fabrication of facts material to the probable cause determination will generate tort liability.").[19]

When the Fourteenth Amendment was ratified, for example, "the generally accepted rule was that one who procured the issuance of an arrest warrant by submitting a complaint could be held liable if the complaint was made maliciously and without probable cause." *Malley v. Briggs*, 475 U.S. 335, 340–41 (1986) (collecting cases). "The same rule applied in the case of search warrants." *Id.* at 341 n.1 (collecting cases); *see generally* Akhil Reed Amar, *Foreword: Lord Camden Meets Federalism—Using State Constitutions to Counter Federal Abuses*, 27 Rutgers L.J. 845, 851, 852 (1996) (noting that "under the Founders' vision, *state* law would help ease and shape the vindication of *federal* constitutional rights" and that "substantively, the trespass law underlying the Fourth Amendment was *state* law" (emphasis in original)).

Here, a genuine question of material fact exists as to whether Officer Pletzke obtained and executed the warrant in good faith. Reasonable minds may differ on the issue, rendering it a question for the finder of fact. Reasonable minds may not differ, however, on the issue of whether the common law immunizes an officer who knowingly fabricates material information to obtain a warrant and then executes it.

Officer Pletzke is not entitled to summary judgment on Plaintiff's conversion of chattels claim.

## 2

Defendants contest this conclusion by asserting that they are immunized "under the facially valid search warrant obtained according to the ordinary and proper procedures." Defs.'

---

[19] Although the Michigan appellate courts do not appear to have addressed this precise question, there is no reason to think that they would decline to follow the traditional rule.

Br. 19.  Additionally, Defendants write, they are "entitled to governmental immunity with regard to this claim."

 While Officer Esterhai is entitled to immunity because there is no evidence that he was aware of the allegedly false statement in the warrant, much less participated in its production, Officer Pletzke is not.  For reasons discussed above, Officer Pletzke is not entitled to summary judgment on Plaintiff's conversion of chattels claim.

**G**

 Finally, count seven of the complaint asserts that Plaintiff is entitled to punitive damages. Defendants do not expressly address this claim in their motion for summary judgment.

**IV**

 Accordingly, it is **ORDERED** that Defendants' motion for summary judgment (ECF No. 9) is **GRANTED IN PART AND DENIED IN PART**.

 It is further **ORDERED** that Defendants are **DENIED** summary judgment on counts one, three, and seven of the complaint.

 It is further **ORDERED** that Defendants are **GRANTED** summary judgment on counts four and five of the complaint.

 It is further **ORDERED** that Defendant Esterhai is  **GRANTED**  summary judgment on counts two and six of the complaint.

 It is further **ORDERED** that Defendants Pletzke is  **DENIED**  summary  judgment  on counts two and six of the complaint.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: March 20, 2013

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 20, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS